## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel*. THOMAS WIMS<br><br>         *Plaintiffs*,<br>   v.<br><br>CONSORTIUM FOR OCEAN LEADERSHIP<br>1201 New York Avenue NW #420<br>Washington, D.C. 20005<br><br>WOODS HOLE OCEANOGRAPHIC INSTITUTION<br>86 Water Street<br>Woods Hole, MA 02543<br><br>RUTGERS, THE STATE UNIVERSITY OF NEW JERSEY<br>450 East Broad Street<br>Bridgeton, NJ 08302<br><br>        *Defendants*. | Civil Action No.: _____<br><br>**COMPLAINT FOR**<br>**FALSE CLAIMS ACT VIOLATIONS**<br>**UNDER 31 U.S.C. § 3729 *ET SEQ.***<br><br>**FILED BY HAND**<br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................1

II.  JURISDICTION AND VENUE ..............................................................................5

III.  PARTIES ...................................................................................................................5

    A.  Plaintiff/Relator .............................................................................................5

    B.  Defendants .....................................................................................................6

        1.  Consortium for Ocean Leadership .....................................................6

        2.  Woods Hole Oceanographic Institution .............................................6

        3.  Rutgers, The State University of New Jersey .....................................7

        4.  John Does Nos. 1-50, Fictitious Names .............................................7

IV.  BACKGROUND.......................................................................................................8

    A.  National Science Foundation..........................................................................8

    B.  NSF Funds .....................................................................................................9

        1.  OOI Funds Awarded by NSF Are Subject to Cooperative Support
            Agreement Requirements and Applicable Federal Administrative
            Standards.............................................................................................9

        2.  COL's Cooperative Agreements Required that COL and its
            Subawardees use Accounting Systems Compliant with Cost
            Accounting Standards (CAS)............................................................14

    C.  American Recovery and Reinvestment Act Funds.............................................15

    D.  Ocean Observatories Initiative .........................................................................18

    E.  Liability And Remedies Under the False Claims Act.........................................20

V.  DEFENDANTS SUBMITTED INVOICES FOR UNALLOWABLE CHARGES
    UNDER THE NSF COOPERATIVE AGREEMENTS...................................................21

    A.  WHOI ..........................................................................................................21

        1.  Defendant WHOI Used a non-CAS Compliant Accounting System
            to Purposefully Deceive NSF and Receive Reimbursement for
            False Invoices....................................................................................21

        2.  Defendant WHOI Submitted False Invoices for Physical Materials
            and Deceived NSF by Concealing the Extent of WHOI's
            Underperformance..............................................................................25

        3.  Defendant WHOI Submitted False Invoices for Inadequate Work
            on the Glider Program and Deceived NSF by Concealing the
            Extent of WHOI's Underperformance ....................................................28

    B.  Rutgers ........................................................................................................35

       1.     Defendant Rutgers Used a non-CAS Compliant Accounting System to Purposefully Deceive NSF and Receive Reimbursement for False Invoices ...................................................................35

       2.     Defendant Rutgers Submitted False Invoices for Inadequate and Unperformed Work and Deceived NSF by Concealing the Extent of Rutgers' Underperformance ...............................................38

   C.     Defendant COL Had Knowledge of and Facilitated the Submission of False Invoices by Subcontractor Defendants .......................................40

VI.   DEFENDANTS CONSPIRED WITH OTHER ENTITIES TO DEFRAUD THE UNITED STATES .....................................................................................48

VII.  DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS .............................................................................50

VIII. COL'S UNLAWFUL RETALIATION AGAINST RELATOR WIMS........................50

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ....................................54

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)) ...................................55

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)) ..................................56

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))..................................56

COUNT V (Violation of False Claims Act, 31 U.S.C. § 3730(h))..............................................57

COUNT VI (Violation of District of Columbia False Claims Act, D.C. Code § 2-381.04).........57

## COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS
## <u>UNDER 31 U.S.C. § 3729 ET SEQ</u>.

This is an action brought on behalf of the United States of America by Thomas Wims ("Relator"), by and through his attorneys, against defendants Consortium for Ocean Leadership ("COL"), Woods Hole Oceanographic Institution ("WHOI"), Rutgers, The State University of New Jersey ("Rutgers" or "University") and John Does #1-50, Fictitious Names, (collectively "Defendants") pursuant to the *qui tam* provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA") and the anti-retaliation provisions of the District of Columbia False Claims Act ("DCFCA"), which prohibits the unlawful termination of employees for reporting a false claim.

## I.   INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States arising from false statements and claims that Defendants knowingly presented to, or caused to be presented to, the United States in violation of the FCA.  This action also seeks to recover damages caused by Defendant COL for unlawfully terminating Relator's employment for reporting internally the extensive fraud he had observed.

2.      For nearly a decade, Defendants have fraudulently obtained millions of dollars in federal grant dollars awarded by the National Science Foundation ("NSF"), "stimulus" monies provided under the American Recovery and Reinvestment Act ("ARRA"), and other federal funding.

3.      Specifically, beginning in 2009, Defendant Consortium for Ocean Leadership ("COL") became the Prime Awardee for NSF's multi-institutional Ocean Observatories Initiative ("OOI"), which involves the installation of a network of instruments, undersea cables, and

instrumented moorings that spans the Western Hemisphere and measures physical, chemical, geological, and biological phenomena in key coastal, regional, and global areas.

4.      COL has been awarded grant funds under separate Cooperative Agreements with NSF involving the OOI.   The initial award made to COL was originally estimated to be $386,420,000.00 and was comprised of two funding sources: the ARRA and NSF's Major Research Equipment and Facilities Construction ("MREFC") Account.   The $105,930,000 in funding from the ARRA was to be applied to the construction and initial operations of the OOI project.   Funds from the MREFC, in the amount of $280,226,490.00, were allocated for "Construction under MREFC."  COL also entered into a Cooperative Agreement with NSF for the "Operations and Maintenance" of the OOI.   As of April 10, 2018, NSF has awarded COL $279,345,487.00 under this particular agreement, which has an estimated end date of September 30, 2018.

5.      Together, COL and its Subawardees have received a total of $665,501,977 in federal funding under these agreements.

6.      Defendant Woods Hole Oceanographic Institution ("WHOI") is a Subawardee under the OOI that has been tasked with operating certain equipment in support of the NSF grant. Specifically, WHOI is responsible for managing a number of ocean "arrays"—underwater cables equipped with sensors—in addition to autonomous underwater vehicles and undersea gliders, which are used to collect ocean data that is relayed to shore via satellite telemetry.

7.      Defendant Rutgers, The State University of New Jersey ("Rutgers" or "University"), is another Subawardee that has been responsible for implementing the cyberinfrastructure component of the OOI, which includes education and public engagement

software that places real-time ocean data in the hands of oceanographers, scientists and researchers, educators and the public.

8.      Both Subawardees were issued subcontracts by COL, and as the Prime Awardee under the OOI, COL has full responsibility for ensuring that WHOI and Rutgers complied with all award conditions.  Moreover, COL is responsible for notifying NSF about "any allegation of research misconduct that it concludes has substance and requires an investigation" or "any significant problems relating to the administrative or financial aspects of the award."

9.      From 2009 to the present, COL has been fully aware of systematic fraud perpetrated by its Subawardees; however, COL either concealed from NSF these activities in their entirety or provided the agency with misleading half-truths regarding the extent of the intentional misconduct.

10.     Defendants WHOI and Rutgers defrauded the NSF by seeking and obtaining reimbursement for: (1) equipment that was never actually purchased and/or used; (2) facility charges that were never incurred; and (3) labor and personnel costs that were never performed. Defendants then knowingly misrepresented to NSF that that these services had been provided and, based on these intentional misrepresentations, illegally drew down grant funds to which they were not entitled.

11.     COL has been fully aware that WHOI and Rutgers were submitting fraudulent requests for reimbursement under the NSF grants since at least 2009.  And despite numerous attempts by Relator and other COL staff to address these issues internally, COL's senior management—specifically COL President/CEO Jonathan White and COL Principal Investigator Greg Ulses—delivered a consistent and unmistakable message that WHOI's and Rutgers' conduct under their Subawards were never to be questioned.

12.    And because Relator refused to stop questioning Defendants' illegal conduct related to the NSF grants, COL unlawfully terminated his employment.

13.    COL concealed from NSF the fact that COL and its Subawardees were not acting in compliance with federal grant requirements.  And each time COL drew down federal grant monies, it falsely certified that the funds expended by Defendants were for services that were performed in conformity with NSF award terms and conditions as well as all applicable federal financial assistance requirements.

14.    As detailed below, Defendants' fraudulent reportings to the Government have caused years of improper and illegal billings to the United States.  As a direct, proximate and foreseeable result of Defendants' fraudulent course of conduct set forth herein, from at least 2009 through the present, Defendants have knowingly made numerous false express and implied certifications and/or caused the submission of hundreds of false or fraudulent statements and false claims to Government programs for payment for their products and services.

15.    Defendants agreed to a common scheme to present these false claims and statements to the United States, and these false claims and statements were made in furtherance of a conspiracy to defraud the United States.  The purpose of the scheme has, at all relevant times, been to receive payment under false pretenses for claims submitted to the United States Government.

16.    As a result of these false certifications, the Government was falsely and/or fraudulently induced to conduct transactions with Defendants, in the form of grant disbursements and additional grant awards.  Because the United States was falsely and/or fraudulently induced to complete these transactions with the Defendants, each claim for payment under the grants was a false claim.

17.     This conduct is continuing.

## II.   JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over claims brought on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, pursuant to 31 U.S.C. §§ 3730 and 3732.

19.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because they transact business and are found in this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

20.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a), because Defendants own and operate businesses within this judicial district, and certain acts that form the basis of this Complaint occurred in this judicial district.

21.     The causes of action alleged herein are timely brought because, among other things, of efforts by Defendants to conceal their wrongdoing.

## III.  PARTIES

### A.   PLAINTIFF/RELATOR

22.     Relator Thomas Wims brings this action on behalf of himself and the United States of America.  Relator is a resident of Maryland.

23.     Relator is an original source of the allegations in this Complaint against Defendants, and the allegations are not based upon publicly disclosed information.  Relator also voluntarily provided the non-public information alleged herein to the Government prior to filing this action in accordance with 31 U.S.C. § 3730(b)(2).

24.    Relator, a former employee of Defendant COL and the former Operations & Maintenance Manager for the Oceans Observatories Initiative, has direct knowledge of the conduct alleged in this Complaint and conducted an independent investigation to uncover false claims submitted to the United States.  Accordingly, Relator is an "original source" of the non-public information alleged in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).

B.    DEFENDANTS

1.    Consortium for Ocean Leadership

25.    Consortium for Ocean Leadership ("COL"), a Washington, D.C.-based nonprofit organization, represents ninety-five of the leading public and private ocean research and education institutions, aquaria and industry with the mission to advance research, education and sound ocean policy.  The organization also manages ocean research and education programs in the areas of scientific ocean drilling, ocean observing, ocean exploration, and ocean partnerships.  COL was formed in 2007 when Consortium for Oceanographic Research and Education and the Joint Oceanographic Institutions ("JOI") merged.  JOI was founded in 1976 and the Consortium for Oceanographic Research and Education was established in 1994.  Since its formation in 2007, COL has managed over one billion dollars in science funding across the United States, Australia, Bermuda and Canada.

2.    Woods Hole Oceanographic Institution

26.    Woods Hole Oceanographic Institution ("WHOI") is a private, non-profit research and higher education facility established in 1930 in Woods Hole, Massachusetts.  WHOI studies all aspects of marine science to further scientific knowledge of the ocean.  The institution has six research departments, four interdisciplinary societies, and over forty centers and laboratories. Accredited by the New England Association of Schools and Colleges, WHOI has approximately

950 employees, multiple research vessels and underwater vehicles, and three national facilities. With regard to the OOI, WHOI is responsible for the Coastal Pioneer Array and the four Global Arrays, including all associated vehicles.

### 3. Rutgers, The State University of New Jersey

27. Rutgers, The State University of New Jersey ("Rutgers" or "University") is a national research campus that was established in 1766. The University has more than 69,000 students and 22,500 full and part-time faculty and staff. Rutgers Discovery Informatics Institute, which is a unit in Rutgers' Office of Research and Economic Development, is a university-wide institute that is focused on Computational and Data-Enabled Science and Engineering. Rutgers implemented the Cyberinfrastructure ("CI") component of OOI, which now includes education and public engagement software. The OOI Data Management team is co-located within the CI group at Rutgers. Rutgers, as the OOI Education and Public Engagement Implementing Organization ("IO"), builds a variety of software interfaces and web-based tools that allow educators and outreach specialists to bring OOI data and transformative science into the classroom.

### 4. John Does Nos. 1-50, Fictitious Names

28. John Does Nos. 1-50, Fictitious Names, are individuals, corporations, limited liability companies, partnerships, trusts, or other lawful business entities through which Defendants do business, and who are unknown co-conspirators who conspired with Defendants to perpetuate the scheme described herein.

29. To the extent that any of the conduct or activities described in this Complaint was not performed by Defendants, but by the individuals or entities described herein as John Does Nos. 1-50, Fictitious Names, any reference herein to "the Defendants" or "Defendants" under such circumstances, and only under such circumstances, refers also to John Does Nos. 1-50, Fictitious

Names, and/or other co-conspirators who conspired with Defendants to perpetrate the scheme described herein.

30.     As a result of actions of John Does Nos. 1-50, Fictitious Names, the United States has suffered financial harm.

## IV.     BACKGROUND

### A.     NATIONAL SCIENCE FOUNDATION

31.     The National Science Foundation ("NSF") is an independent Federal agency created by the National Science Foundation Act of 1950 (P.L. 810-507).  Its mission is "to promote the progress of science; to advance the national health, prosperity, and welfare; and to secure the national defense."  NSF was created and directed by Congress to initiate and support basic scientific research and other scientific programs by providing grants, loans, cooperative agreements, contracts and other forms of financial assistance to individuals, businesses and academic and nonprofit institutions. 42 U.S.C. § 1862.   Interested applicants send grant applications to the NSF, which disburses congressionally-appropriated funds to each specifically approved project. *Id.* § 1863.  NSF is also committed to ensuring an adequate supply of the nation's scientists, engineers, and science educators.

32.     The NSF receives approximately 40,000 proposals each year for research, education and training projects, of which approximately 11,000 are funded.  In addition, the NSF receives several thousand applications for graduate and postdoctoral fellowships.

33.     The NSF operates no laboratories itself but does support National Research Centers, user facilities, certain oceanographic vessels and Antarctic research stations.  The NSF also supports cooperative research between universities and industry, participation by the United

States in international scientific and engineering efforts, and educational activities at every

academic level.

B.      NSF FUNDS

1.      OOI Funds Awarded by NSF Are Subject to Cooperative Support
        Agreement Requirements and Applicable Federal Administrative
        Standards

34.     COL entered into a Cooperative Support Agreement ("CSA") (Award Number

OCE-1026342), effective January 1, 2010, for the "Operations and Maintenance of the Ocean

Observatories Initiative (OOI)." The CSA explained that "The Awardee is responsible for full

compliance with all Financial/Administrative and Programmatic Terms and Conditions as initially

stated or as updated over the life of the governing Cooperative Agreement (CA) and this CSA."

Every COL request to draw down funds under the CSA "will represent acceptance by the Awardee

of all Terms and conditions of the CA and CSA." In addition to incorporating NSF's FATC into

the CSA, the document titled "Cooperative Agreement Supplemental Financial/Administrative

Terms and Conditions- Large Facilities" ("FATC-LF") was incorporated through Part 1.1 of the

CSA.

35.     Part 1.1(b) of the CSA explained that necessary deviations from the FATC and

FATC-LF to meet specific needs and requirements of the CSA "are provided in full text herein,

and by any subsequent amendments." Those deviations could create inconsistencies between some

of the requirements for which COL was responsible for ensuring compliance. In the event that

multiple requirements were incongruent, Part 1.1(d) of the CSA delineated the Order of

Precedence of the various documents governing the CSA and CA:

> The award-specific terms and conditions of this CSA, Parts 1 and 2, take
> precedence over the FATC-LF. The FATC-LF takes precedence over the FATC.
> Should there be any inconsistency between the terms and conditions of this CSA
> and the CA, the terms of the CSA shall govern and take precedence provided,
> however, the inconsistency shall not affect the remaining terms of the CA.

36.     NSF Cooperative Agreements are also subject to specific Financial & Administrative Terms and Conditions ("FATC").  The FATC are clear that "the awardee has full responsibility for the conduct of the project or activity supported under this award and for adherence to the award conditions." Should the awardee discover potential violations of the award conditions, "the awardee is responsible for notifying NSF about: (1) any allegation of research misconduct that it concludes has substance and requires an investigation in accordance with NSF research misconduct regulations published at 45 Code of Federal Regulations (C.F.R.) Part 689; or (2) any significant problems relating to the administrative or financial aspects of the award."

37.     The FATC requires that equipment purchases are "(a) necessary for the research or activity supported by the grant; (b) not otherwise reasonably available and accessible; (c) of the type normally charged as a direct cost to sponsored agreements; and (d) acquired in accordance with organizational practice."

38.     NSF's FATC also incorporated by reference other applicable Federal administrative standards, including "2 CFR Part 215, Uniform Administrative Requirement for Grants and Cooperative Agreements with Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations. NSF has determined that 2 CFR Part 215 standards also will be applied to commercial organizations, including small businesses."

39.     Recipients of Cooperative Agreements also agreed "to comply with the applicable Federal requirements for cooperative agreements and to the prudent management of all expenditures and actions affecting the award." Compliance required that "documentation for each expenditure or action affecting this award [must] reflect appropriate organizational reviews or approvals that should be made in advance of the action." NSF's FATC explained that:

Organizational reviews are intended to help assure that expenditures are allowable, necessary and reasonable for the conduct of the project and that the proposed action:

(1) Is consistent with award terms and conditions;
(2) Is consistent with NSF and awardee policies;
(3) Represents effective utilization of resources; and
(4) Does not constitute a significant project change.

40.    The Code of Federal Regulations sets forth the requirements for expenditures to be allowable, allocable, and reasonable under cooperative agreements. This not only includes 2 C.F.R. § 215, but also 2 C.F.R. § 220 (Cost Principles for Educational Institutions (OMB Circular A-21)) and 2 C.F.R. § 230 (Cost Principles for Non-Profit Organizations (OMB Circular A-122)).

41.    Recipients of Cooperative Agreement funds are required under 2 C.F.R. § 215.21(b) to maintain financial management systems that provide for:

(1) Accurate, current and complete disclosure of the financial results of each federally-sponsored project or program in accordance with the reporting requirements set forth in § 215.52…
(2) Records that identify adequately the source and application of funds for federally-sponsored activities. These records shall contain information pertaining to Federal awards, authorizations, obligations, unobligated balances, assets, outlays, income and interest.
(3) Effective control over and accountability for all funds, property and other assets. Recipients shall adequately safeguard all such assets and assure they are used solely for authorized purposes.
(6) Written procedures for determining the reasonableness, allocability and allowability of costs in accordance with the provisions of the applicable Federal cost principles and the terms and conditions of the award.
(7) Accounting records including cost accounting records that are supported by source documentation.

42.    The applicable Federal cost principles "for determining the reasonableness, allocability and allowability of costs" for educational institutions such as Rutgers can be found at 2 C.F.R. § 220. Appendix A Section C(2) enumerates the four factors affecting allowability of costs:

(1) They must be reasonable;
(2) They must be allocable to sponsored agreements under the principles and methods provided herein;

Filed Under Seal
11

(3) They must be given consistent treatment through application of those generally
accepted accounting principles appropriate to the circumstances;

(4) And they must conform to any limitations or exclusions.

2 C.F.R. § 220.

43.     Costs may be considered "reasonable" under 2 C.F.R § 220 Appendix A Section

C(3) "if the nature of the goods or services acquired or applied, and the amount involved therefore,

reflect the action that a prudent person would have taken under the circumstances prevailing at the

time the decision to incur the cost was made." Factors that should be considered in determining

the "reasonableness" of a cost include:

(1) whether or not the cost is of a type generally recognized as necessary for the
operation of the institution or the performance of the sponsored agreement;

(2) the restraints or requirements imposed by such factors as arm's-length
bargaining, Federal and State laws and regulations, and sponsored agreement
terms and conditions;

(3) whether or not the individuals concerned acted with due prudence in the
circumstances, considering their responsibilities to the institution, its
employees, its students, the Federal Government, and the public at large;

(4) and, the extent to which the actions taken with respect to the incurrence of the
cost are consistent with established institutional policies and practices
applicable to the work of the institution generally, including sponsored
agreements.

44.     Appendix A Section C(4)(a) governs whether or not a cost is to be considered

"allocable." 2 C.F.R. § 220.  "A cost is allocable to a particular cost objective (*i.e.*, a specific

function, project, sponsored agreement, department, or the like) if the goods or services involved

are chargeable or assignable to such cost objective in accordance with relative benefits received or

other equitable relationship. Subject to the foregoing, a cost is allocable to a sponsored agreement

if it is incurred solely to advance the work under the sponsored agreement; it benefits both the

sponsored agreement and other work of the institution, in proportions that can be approximated

through use of reasonable methods, or it is necessary to the overall operation of the institution and,

in light of the principles provided in this Appendix, is deemed to be assignable in part to sponsored projects." *Id*.

45.     To ensure that costs are assignable to a particular cost objective and appropriate to the project, the regulations assign the recipient institution with the responsibility "for ensuring that costs charged to a sponsored agreement are allowable, allocable, and reasonable under these cost principles." 2 C.F.R. § 220 Appendix A Section C(4)(d.)(1).

46.     The applicable Federal cost principles "for determining the reasonableness, allocability and allowability of costs" for non-profit entities such as COL, WHOI and Rutgers can be found at 2 C.F.R. § 230.  Appendix A Section C (2) enumerates the seven factors affecting allowability of costs:

> (a) Be reasonable for the performance of the award and be allocable thereto under these principles.
> (b) Conform to any limitations or exclusions set forth in these principles or in the award as to types of amount of cost items.
> (c) Be consistent with policies and procedures that apply uniformly to both federally-financed and other activities of the organization.
> (d) Be accorded consistent treatment.
> (e) Be determined in accordance with generally accepted accounting principles (GAAP).
> (f) Not be included as a cost or used to meet cost sharing or matching requirements of any other federally-financed program in either the current or a prior period.
> (g) Be adequately documented.

2 C.F.R. § 230.

47.     For non-profit participants of Cooperative Agreements, the regulation states that "A cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the costs." 2 C.F.R. § 230, App. A Section A(3).  Four factors should be considered in determining whether the cost is "reasonable" or not:

(a) Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the organization or the performance of the award.

(b) The restraints or requirements imposed by such factors as generally accepted sound business practices, arm's length bargaining, Federal and State laws and regulations, and terms and conditions of the award.

(c) Whether the individuals concerned acted with prudence in the circumstances, considering their responsibilities to the organization, its members, its employees, and clients, the public at large, and the Federal Government.

(d) Significant deviations from the established practices of the organization which may unjustifiably increase the award costs.

*Id.*

48.     "A cost is allocable to a Federal award if it is treated consistently with other costs incurred for the same purpose in like circumstances and if it:

(1) Is incurred specifically for the award.

(2) Benefits both the award and other work and can be distributed in reasonable proportion to the benefits received, or

(3) Is necessary to the overall operation of the organization although a direct relationship to any particular cost objective cannot be shown.

2 C.F.R. § 230 App. A Section A(4).

### 2.     COL's Cooperative Agreements Required that COL and its Subawardees use Accounting Systems Compliant with Cost Accounting Standards (CAS)

49.     On September 30, 2010, the NSF Office of the Inspector General ("NSF OIG") released its Audit Reports of COL's Accounting System (Audit Report No. OIG-10-1-011) and the Proposed Budget for OOI (Audit Report No. OIG-10-1-012).  NSF OIG contracted with the Defense Contract Audit Agency ("DCAA") to perform these audits. The objectives of DCAA's audit were threefold:

1. Assess the adequacy of COL's accounting system to properly accumulate and bill costs under NSF awards, determine whether COL adequately accumulates, segregates and reports the use of ARRA funds, determine whether COL adequately monitors its subawardees' compliance with Federal requirements.

2. Examine the OOI construction proposal to determine if COL's proposed budget was prepared in accordance with applicable federal requirements, including the Cost Accounting Standards (CAS) and if the proposed costs are acceptable as a basis to negotiate a fair and reasonable price. This included performing audit

tests at two of COL's major subawardees, the University of Washington (UW) and Woods Hole Oceanographic Institute [sic] (WHOI).

3.  Assess the adequacy of WHOI's accounting system to properly track, account for, segregate and report on equipment purchased using federal funds, including equipment purchased with ARRA funds.

50.     While DCAA was not asked to assess whether COL's accounting system was CAS compliant, DCAA noted in its memo summarizing its audit findings that "NSF is the cognizant federal agency for COL, and that COL is subject to Cost Accounting Standards." In a footnote, NSF OIG explained:

> COL is required to follow CAS because its NSF Contract No. OCE-0352500, *System Integration Contractor for the Integrated Ocean Drilling Program*, dated September 2003, includes the FAR clause that incorporates CAS requirements into the contract. Therefore, COL's CAS Disclosure Statement is applicable to all of COL's federal contracts and awards, including all of COL's cooperative agreements with NSF.

51.     Accordingly, at all times material hereto, COL was required to employ a CAS-compliant accounting system.

C.      AMERICAN RECOVERY AND REINVESTMENT ACT FUNDS

52.     On February 17, 2009, the President signed into law the American Recovery and Reinvestment Act, Pub. L. No. 111-5, 123 Stat. 304 (2009) (the "ARRA"), which was designed to create new jobs and save existing jobs, spur economic activity, invest in long-term growth, and foster unprecedented levels of accountability and transparency in government spending. ARRA, § 3(a).

53.     NSF used ARRA investments totaling $601 million as of October 2010 to fund significant infrastructure developments, which included construction in the OOI.

54.     NSF grants of ARRA funds are subject to both NSF's regulations and the requirements tied to funding through the ARRA. NSF published a document entitled "American

Recovery and Reinvestment Act of 2009 Terms and Conditions" ("ARRA T&C"), effective May

2009. The following conditions were tied to ARRA funds:

> **Article 1. National Science Foundation American Recovery and Reinvestment Act of 2009 (ARRA) (Public Law 111-5) Award Term**
> (a) This award is funded under the American Recovery and Reinvestment Act of 2009 (ARRA) (Public Law 111-5). Unless otherwise specified, ARRA funding should be considered one-time funding.
> (b) Recipients must comply with standard NSF award conditions (Research Terms and Conditions or Grant General Conditions, as applicable) as well as the requirements set forth in ARRA, including, but not limited to, the reporting requirements specified in the award term entitled, "Reporting and Registration 5," as well as the accompanying OMB guidance (available on the Recovery.gov website). Failure to submit timely reports may result in NSF taking administrative action, including disallowance of costs or the suspension or termination of the award.
> (c) Recipients of ARRA funds are reminded that such funds must be separately tracked and monitored independently from any non-ARRA funding.
> (d) Recipients of ARRA funds are reminded that ARRA-related terms and conditions are required to be incorporated into any subrecipient agreements, as appropriate.
> (e) NSF will monitor ARRA funds, and, if, after 12 months, no allowable expenditures have been incurred, NSF may consider reducing or terminating the award and reallocating the funds.

55.     Article 3 of the ARRA T&C, entitled "Recovery Act Transactions listed in

Schedule of Expenditures of Federal Awards and Recipient Responsibilities for Informing Sub-

recipients)," provides guidance to recipients for how they were to track ARRA funds and identify

expenditures for an audit:

> (a) To maximize the transparency and accountability of funds authorized under the American Recovery and Reinvestment Act of 2009 (Public Law 111-5) (Recovery Act) as required by Congress and in accordance with 2 CFR 215, subpart __. 21 "Uniform Administrative Requirements for Grants and Agreements" and OMB A-102 Common Rules provisions, recipients agree to maintain records that identify adequately the source and application of Recovery Act funds.
> (b) For recipient covered by the Single Audit Act Amendments of 1996 and OMB Circular A-133, "Audits of States, Local Governments, and Non-Profit Organizations," recipients agree to separately identify the expenditures for Federal awards under the Recovery Act on the Schedule of Expenditures of Federal Award (SEFA) and the Data Collection Form (SF-SAC) required by OMB Circular A-133. This shall be accomplished by identifying expenditures

for Federal awards made under Recovery Act separately on the SEFA, and as
separate rows under Item 9 of Part III on the SF-SAC by CFDA number, and
inclusion of the prefix "ARRA-" in identifying the name of the Federal program
on the SEFA and as the first characters in Item 9d of Part III on the SF-SAC.

56.     Article 3 also contains two provisions concerning "Recipient Responsibilities for

Informing Sub-recipients." These requirements ensure that subrecipients properly track ARRA

funds in a similar manner as the original recipient:

> (c) Recipients agree to separately identify to each subrecipient, and document at
> the time of subaward and at the time of disbursement of funds, the Federal
> award number, CFDA number, and amount of Recovery Act funds. When a
> recipient awards Recovery Act funds for an existing program, the information
> furnished to sub-recipients shall distinguish the sub-awards of incremental
> Recovery Act funds from regular sub-awards under the existing program.
> (d) Recipients agree to require their subrecipients to include on their SEFA
> information to specifically identify Recovery Act funding similar to the
> requirements for the recipients SEFA described above. This information is
> needed to allow the recipient to properly monitor sub-recipient expenditure of
> ARRA funds as well as oversight by the Federal awarding agencies, Offices of
> Inspector General and the Government Accountability Office.

57.     NSF awarded Defendants $105,930,000 in funding from the ARRA in September

2009.  The Abstract for this award, Award Number 0964093, explains that the ARRA funds were

to be applied to the construction and initial operations of the OOI project.  All of the Defendants

were aware of the ARRA's obligations prior to requesting or receiving money paid by the Federal

government.

58.     Defendants were also aware that under Article 6 of the ARRA T&C, they were

required to "promptly refer to the NSF Inspector General any credible evidence that a principal,

employee, agent, contractor, sub-grantee, subcontractor, or other person has submitted a false

claim under the False Claims Act or has committed a criminal or civil violation of laws pertaining

to fraud, conflict of interest, bribery, gratuity, or similar misconduct involving those funds."

59.     In requesting and receiving millions of dollars from the Federal government

pursuant to the ARRA, and by obtaining other federal funds, Defendants have engaged in

fraudulent conduct to submit false claims for payment or approval by the United States, by, *inter alia*, falsely representing they are in compliance with federal laws and regulations requiring that the use of federal funds was an appropriate use of taxpayer money, which is a core prerequisite to eligibility for the ARRA and other funds from the United States.

60.     Defendants had, and continue to have, actual knowledge that they are not complying with their ARRA and other obligations, that their representations of compliance were and are false, and that Defendants therefore were and are submitting false or fraudulent representations of compliance.

D.     OCEAN OBSERVATORIES INITIATIVE

61.     The National Science Foundation-funded Ocean Observatories Initiative ("OOI") is an integrated infrastructure program composed of science-driven platforms and sensor systems that measure physical, chemical, geological and biological properties and processes from the seafloor to the air-sea interface.  The OOI network was designed to address critical science-driven questions that will lead to a better understanding and management of our oceans, enhancing our capabilities to address critical issues such as climate change, ecosystem variability, ocean acidification, and carbon cycling.

62.     The OOI is funded by the NSF and is managed and coordinated by the OOI Program Office at the COL, in Washington, D.C.  COL is the leader, owner, and operator of the OOI and its infrastructure.  Implementing Organizations ("IOs"), subcontractors to COL, are responsible for construction and development of the different components of the program.

63.     COL has been awarded grant funds under separate Cooperative Agreements with NSF involving the OOI.  The initial award (Award Number 0957938) made to COL was estimated to be $386,420,000.00 and was comprised of two funding sources: the ARRA and NSF's Major

Research Equipment and Facilities Construction ("MREFC") Account.  The $105,930,000 in funding from the ARRA (Award Number 0964093) was to be applied to the construction and initial operations of the OOI project.  Funds from the MREFC (Award Number 1005697), in the amount of $280,226,490.00, was allocated for "Construction under MREFC."

64.     Finally, on March 8, 2010, COL entered into another Cooperative Agreement with NSF (Award Number 1026342) for the "Operations and Maintenance" of the OOI.  As of April 10, 2018, NSF has awarded COL $279,345,487.00 under this particular agreement, which has an estimated end date of September 30, 2018.

65.     Together, COL and its Subawardees have received a total of $665,501,977 in federal funding under these agreements.

66.     Defendant WHOI is responsible for the Coastal Pioneer Array and the four Global Arrays, including all associated vehicles. The Coastal Pioneer Array is located off the mid-Atlantic coast. Global Arrays include four high latitude sites: Irminger Sea off Greenland, Argentine Basin off the coast of Argentina, Southern Ocean at 55°S, 90°W, and Ocean Station Papa in the Gulf of Alaska.

67.     Key WHOI personnel who have worked on OOI include Co-Principal Investigator John Trowbridge, Co-Principal Investigator Robert Weller, and Project Manager Paul Matthias.

68.     Defendant Rutgers is implementing the Cyberinfrastructure ("CI") component of the OOI, which now includes education and public engagement software. The OOI CI manages and integrates data from all OOI sensors, linking marine infrastructure to scientists and users as well as providing observatory mission command and control, data assessment and distribution, and long-term data management. The OOI Data Management team is co-located within the CI group at Rutgers.

69.     Key Rutgers personnel who have worked on the OOI include CI Principal Investigator Manish Parashar, Science/User Co-Principal Investigator Scott Glenn, Science/User Co-Principal Investigator Oscar Schofield, System Engineering Program Manager Ivan Rodero, Science Program Manager Mike Crowley, Data Manager Mike Vardaro, and User Support Manager Sage Lichtenwalner.

### E.     LIABILITY AND REMEDIES UNDER THE FALSE CLAIMS ACT

70.     The False Claims Act ("FCA"), as amended by the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. 111-21, § 4(f), 123 Stat, 1617, 1625 (2009), provides in pertinent part that a person is liable to the United States Government for three times the amount of damages the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). Prior to the FERA amendments, the FCA provided that a person is liable to the United States Government for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . [a] false or fraudulent claim for payment or approval." *Id*. § 3729(a)(1).

71.     The FCA defines the term "claim" to mean "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be drawn down or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (i) provides or has provided any portion of the money or property requested or demanded; or (ii) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Id*. § 3729(b)(2)(A).

72.     As amended by FERA, the FCA also makes a person liable to the United States Government for three times the amount of damages which the Government sustains because of the act of that person, plus a civil penalty, for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. § 3729(a)(1)(B).  The FCA, prior to the FERA amendments, provided that a person is liable to the United States Government for each instance in which the person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." *Id*. § 3729(a)(2).

73.     The FCA defines the terms "knowing" and "knowingly" to mean that a person, with respect to information: (1) "has actual knowledge of the information"; (2) "acts in deliberate ignorance of the truth or falsity of the information"; or (3) "acts in reckless disregard of the truth or falsity of the information."  *Id*. § 3729(b)(1)(A).  The FCA further provides that "no proof of specific intent to defraud is required."  *Id*. §§ 3729(b), 3729(b)(1)(B).

## V.     DEFENDANTS SUBMITTED INVOICES FOR UNALLOWABLE CHARGES UNDER THE NSF COOPERATIVE AGREEMENTS

### A.     WHOI

#### 1.     Defendant WHOI Used a non-CAS Compliant Accounting System to Purposefully Deceive NSF and Receive Reimbursement for False Invoices

74.     As a condition of receiving payment for costs and effort expended on the OOI, WHOI certified that each Request for Funds "has been drawn in accordance with the Terms and Conditions of the Subaward and that the Funds will be appropriately accounted for."  Among the Terms and Conditions of the Subaward was the responsibility to be in full compliance with all NSF FATC, incorporated by reference into the Subaward.   This included the Federal cost

principles found in 2 CFR Part 230, Cost Principles for Nonprofit Organizations (OMB Circular A-22).

75.     In spite of this requirement, WHOI intentionally failed to keep records of costs associated with facilities in accordance with its Subaward.  Instead of coding each cost with a specific category—such as "labor"—WHOI submitted invoices to COL that utilized vague "control accounts" created by WHOI.  The underlying manpower, materials, and facilities to support each "control account" were never identified by WHOI.  In total, WHOI maintained several hundred of these ambiguous "control accounts" and listed each account as a commodity. To further conceal its fraudulent requests for funds for reimbursement, WHOI charged portions of a single cost to multiple "control accounts," thereby intentionally limiting the effectiveness of any oversight, including a potential audit.

76.     WHOI also improperly converted some of these cryptic "control accounts" into its own bank accounts—accounts where WHOI deposited NSF funds that it had drawn down for no allocable use under its Subaward.  More specifically, whenever WHOI would draw down NSF funds for its monthly costs—typically $5 million—it would also draw down an extra $1 million, which it would place in separate control account(s) ostensibly to cover "contingencies."  And WHOI repeated this draw down for "contingencies" every month under its Subaward, creating a nearly untraceable "contingency" fund of approximately $10 million every year.

77.     Relator expressed his concerns about this practice to COL leadership, pointing out that WHOI's use of ambiguous control accounts made properly tracking this "contingency" money more difficult—even beyond trying to determine the allowability of these funds toward any particular use.  Relator also noted to COL senior management that in many instances it was not possible to track how long WHOI had kept "contingency" funds in these control accounts or

whether WHOI was generating interest off of these NSF monies.  Despite raising these concerns, Relator was instructed by COL leadership, including Vice President Greg Ulses, that COL staff were to keep their "hands off" of WHOI under the OOI.

78.     WHOI's non-compliant accounting system also conceals unallowable charges for labor and personnel.  WHOI does not provide personnel or labor reports to COL, thereby preventing audits of their manpower.  WHOI does, for its own purposes, track personnel costs performed on a per-project basis in order to maintain its internal payroll and general accounting systems.

79.     But WHOI has refused to submit to COL a list of employees and subcontractors assigned to the OOI program and failed to properly identify personnel hours within each "control account"—a requirement under its Subaward.  The failure to provide this specific information has allowed WHOI to charge NSF for personnel costs that WHOI has not actually incurred.

80.     For example, from approximately 2010 through the present, WHOI subcontracted some of the work on the OOI to Raytheon Integrated Defense Systems Group ("Raytheon"). Raytheon placed thirteen of its own engineers on the OOI working for WHOI.  On approximately December 31, 2016, Raytheon pulled its employees off of the OOI for a combination of reasons, including (1) WHOI's failure to pay Raytheon for its labor and personnel costs over the previous two months; (2) receiving late payments for the preceding six to twelve months; and (3) not being issued a subaward that was scheduled to commence in January 2017.

81.     After Raytheon's employees were removed from the OOI, WHOI continued to delay payment to Raytheon for approximately eight months.  Not until August of 2017 did WHOI ultimately pay Raytheon for amounts owed for November and December 2016.

82.     Meanwhile, WHOI itself was able to (and did) draw down on NSF funds for its own costs.  And, importantly, the costs WHOI charged to NSF during this time period did not reflect a decrease in expenses corresponding to the removal of thirteen engineers (or Full Time Equivalents) from the project.

83.     WHOI kept insufficient records of its expenses with the principal purpose of defrauding the Government by concealing unallowable charges.

84.     Relator Wims (COL's COTR for the OOI), Patrick Donahue (COL's Contracting Officer), and Yan Xing (COL's CFO) repeatedly informed COL President and CEO Jon White and COL Principal Investigator Greg Ulses that WHOI's invoices were inaccurate and resulted in overcharges to NSF.  Relator and others complained to COL management that WHOI's repeated failure to provide accurate headcount for personnel on the OOI prevented COL from performing its oversight role and allowed WHOI to obtain reimbursement for labor costs it never incurred.

85.     White and Ulses responded that COL had long accepted WHOI's invoices as presented and would not make any special request that WHOI modify how it submitted claims for payment.  White and Ulses also instructed COL personnel to not look further into any other time reporting and/or invoicing errors.

86.     On or about August 3, 2015, COL submitted its request for funding for the operations and maintenance of the OOI for the remainder of 2015 and a portion of 2016.  The document, entitled "2015 OOI O&M 1030 Justification," included estimated costs by category for COL and its subawardees, including WHOI.  Page 6 of the proposal document contains a chart of WHOI's categorized costs, which estimates $0 in "Labor" costs to NSF.  However, WHOI also estimates $18,023,682 in the "Other Direct Costs."  Page 7 of the document contains the following table, which breaks down the amounts of "Other Direct Costs" by category.

| Coastal Global - Other Direct Cost Table | | | | | |
|---|---|---|---|---|---|
| Array | Cruise Cost | Shipping | Instrument Refurbishment | Materials - Refurbishment | Total |
| Operations | $33,709 | 0 | 0 | 0 | $33,709 |
| 55S Southern Ocean | $1,484,905 | $347,768 | $355,948 | $660,418 | $2,849,040 |
| Argentine Basin | $1,486,602 | $429,344 | $355,948 | $660,418 | $2,932,313 |
| Irminger Sea | $1,683,608 | $205,831 | $355,948 | $660,418 | $2,905,806 |
| Station Papa | $1,010,330 | $102,495 | $225,266 | $425,697 | $1,763,788 |
| Pioneer | $2,220,397 | $0 | $2,531,793 | $1,550,838 | $6,303,027 |
| AUV | $309,000 | $0 | $721,000 | $206,000 | $1,236,000 |
| **TOTAL** | $8,228,551 | $1,085,439 | $4,545,904 | $4,163,790 | **$18,023,684** |

87.     Within the "Refurbishment" categories of "Other Direct Costs," WHOI charged for labor costs, including program management, accounting, contracts management, equipment assembly and disassembly and technical work activities, facilities costs, equipment vendor refurbishment labor costs, equipment vendor parts costs, and shipping and receiving charges.

88.     Including all of these costs in a singular category, WHOI could (and did) overcharge NSF without having to provide specific line items delineating WHOI's actual costs.

89.     In fact, WHOI never actually provided COL, or in turn NSF, with a breakdown of those costs in WHOI's invoices.  Instead, WHOI aggregated those costs into various "control accounts" and then invoiced NSF for a lump sum for each control account without specifying labor, facility, or physical materials charges.

90.     WHOI was ultimately paid monies for costs that it would not otherwise have been paid had it fully disclosed the nature of those purchases under the applicable rules and regulations.

**2.     Defendant WHOI Submitted False Invoices for Physical Materials and Deceived NSF by Concealing the Extent of WHOI's Underperformance**

91.     Despite its obligation to maintain full compliance with the Federal cost principles found in 2 CFR Part 230, WHOI intentionally failed to keep records of costs associated with physical materials in accordance with its Subaward.

92.     Specifically, WHOI submitted invoices for reimbursement that contained charges for lost, damaged, or out of service equipment.  The following paragraphs contain examples of the physical materials for which WHOI fraudulently requested and received reimbursement from NSF, despite the fact that the equipment was not being used in furtherance of the OOI.

93.     WHOI was responsible for deploying Autonomous Underwater Vehicle ("AUV") docking stations.  The docking stations are large, undersea towers capable of charging AUVs from a short distance away.  After deploying two such docking stations, WHOI discovered that they worked properly at a depth of approximately 100 feet, but they did not function at a depth of one mile, as was necessary to meet the specifications for that portion of the OOI.  As a result, WHOI decided to remove the docking stations from the ocean.

94.     Upon learning of the operational failure of the docking stations, Kongsberg Maritime, the manufacturer, offered (free of charge) to send its employees to WHOI in an effort to resolve the problem.  WHOI refused Kongsberg's offer.  And instead of informing NSF of the decision to remove the docking stations from the ocean, WHOI instead simply placed the equipment in its parking lot.   Further, WHOI failed to refurbish the stations after deploying them in the ocean, which caused the equipment (worth an estimated $1 million each) to deteriorate and become unusable for future deployments.

95.     Despite the fact that the docking stations were out of service, WHOI continued to submit and receive reimbursements for invoices related to the operations and maintenance of the stations.

96.     Another piece of physical equipment that WHOI fraudulently sought and received reimbursement for was the Irminger Sea Surface Mooring (the "Mooring").  The Mooring was comprised of a piece of styrofoam approximately fifteen feet in diameter and held science,

communications, and engineering equipment. A cable, approximately one mile in length, anchored the Mooring to the sea floor. In January or February 2017, a storm struck the North Atlantic Ocean where the Mooring was located. In advance of the storm, Relator approached COL President and CEO Jon White and asked how the Mooring would be affected by the storm and whether COL needed to take any action to minimize any risks. White incorrectly insisted that the Mooring would be unaffected; the storm caused the cable to break and the Mooring was lost at sea.

97.    After the storm, WHOI initially told White not to worry about the Mooring and directed him not to inform NSF regarding the lost equipment. White forwarded those instructions to Relator and other COL employees.

98.    However, because NSF's Bauke Houtman was scheduled to attend an international conference where knowledge of the lost Mooring was known, WHOI and COL relented and reluctantly informed Houtman that the Mooring had broken free of its cable and could not be located. White and Ulses told Houtman that they would discuss the situation further with WHOI and take appropriate steps to remedy the problem.

99.    Despite their promise to NSF, neither COL nor WHOI took any measures to replace the Mooring. Failing to replace the Mooring prevented other arrays in the area from transmitting the data collected, because the other arrays required a Mooring to communicate the information. Not only did WHOI fail to collect data from the Mooring, but it also continued to submit invoices and receive reimbursement for performing operations and maintenance on the Mooring for at least one year after it was lost at sea.

100.    WHOI has never attempted to correct any of these fraudulent submissions despite knowing that the corresponding charges were unallowable.

101.    WHOI's decision to maintain non-compliant records of its expenses has been part of its scheme to defraud the Government by concealing unallowable charges.

### 3.    Defendant WHOI Submitted False Invoices for Inadequate Work on the Glider Program and Deceived NSF by Concealing the Extent of WHOI's Underperformance

102.    As part of its Subaward under the OOI, WHOI was assigned duties to prepare and deploy Slocum Gliders in the oceans.  These gliders were designed to spend several months, unattended, at sea.  Teledyne Webb Research ("Teledyne") fabricated the gliders and sent them to WHOI for field deployment, data collection, and limited assembly and refurbishment activities.

103.    The gliders descended to depths between 200 meters and 1000 meters below the sea surface, depending on location and mission.  The glider's relatively compact, complex and sophisticated structure was designed to withstand extreme sea conditions and temperate changes while at the surface, as well as the flexing and movement associated with the pressure and temperature changes as the glider descended to its operating depth.

104.    On April 20, 2017, WHOI reported to COL that each of the last four glider deployments resulted in leaks, which required the retrieval of the gliders from the ocean.  One week later, on April 27, Relator initiated a glider leak investigation.  Between May 3 and May 5, Relator and Les Anderson traveled to Teledyne to observe technical tests being conducted on the gliders in an effort to identify the source of the leak in each glider and to determine responsibility for those leaks.  Over the following two weeks, Relator and Anderson worked on separate draft reports and then merged them into one draft report intended to be submitted to NSF as COL's official report on the glider leak investigation.

105.    On Monday, May 8, 2017, Relator submitted to the OOI Glider File a Preliminary Assessment Memo.  Relator's assessment found that WHOI followed "poor re-assembly processes and procedures" and failed to use "a clean air (clean room) environment for final glider assembly

at WHOI, [which] is indicated by lint and/or hair fibers on the O-Rings." Relator recommended that "WHOI should consider allowing [Teledyne] to ballast gliders to avoid re-opening a [Teledyne] tested glider prior to deployment" and that "WHOI should consider using external ballasts to eliminate the need for re-opening tested gliders."

106.    WHOI maintained the purpose of re-opening the gliders was to ballast, or add weight to, the gliders. The amount of ballasting was supposed to be determined by the water density of the oceanic location where the glider would be deployed, as water density varies throughout the oceans. However, WHOI never actually calculated the specific amount of ballast that should be added to each glider.

107.    Relator is aware that Teledyne, the manufacturer of the gliders, informed WHOI that the additional ballasting of the gliders was unnecessary, and pointed to the United States Navy's program, which kept the gliders at a neutral ballasting point so that the gliders would operate properly no matter the conditions or density of the water.

108.    Even if it had been necessary for WHOI to perform additional ballasting of the gliders, Teledyne offered a version of the glider that did not require re-opening in order to ballast. This particular glider came equipped with mounting rails on each side of the glider, on which ballasts could be mounted.  No disassembly was needed.

109.    WHOI refused to purchase those gliders, which allowed it to perform the additional, but unnecessary, work on the gliders before deploying them.  This refusal was critical in enabling WHOI to seek and receive additional reimbursement from NSF for the unnecessary service.

110.    WHOI's re-opening and re-sealing of the gliders led directly to the leaks.  And WHOI's own procedures were the root cause.  Specifically, WHOI did not have a clean room, or a positive pressure room, both of which dramatically reduce the risk of contaminants interfering

with the seals on the gliders.  Furthermore, WHOI permitted employees to bring their pet dogs into the laboratory where the gliders were being re-opened and re-sealed, greatly increasing the contamination risks associated with that work.

111.    In May, after drafting his report on the leak investigation, Relator recommended to COL President and CEO Jon White that WHOI be instructed to cease releasing gliders and to shift all glider operations to Teledyne.  White refused, informing Relator that COL was not going to tell WHOI what to do about the gliders, despite the myriad of problems known to COL.

112.    On June 8, 2017, Relator sent a draft directive to COL Vice President Greg Ulses. The proposed directive from COL to WHOI would have ordered "that all gliders be prepared for ocean deployments, by [Teledyne] and WHOI and/or OSU [Oregon State University], at the [Teledyne] facility."  The directive stated that the goal was "to ensure the highest probability of success for the glider program" and "to ensure the best use of National Science Foundation (NSF) funds and to increase the probability of science data collection during the remainder of 2017 and 2018."

113.    However, White and Ulses initially delayed and then refused to send the directive to WHOI.  They also refused to share the directive with NSF, thereby concealing a solution to the glider problem and a means of reducing costs to NSF.  Ultimately, COL and WHOI prioritized collecting money from NSF over the collection of science data.

114.    On June 26, 2017, Relator sent a draft of a memo and report on the glider investigation to Ulses.  The memo plainly placed responsibility for the glider leaks with WHOI: "COL determines that the four leaking gliders in the Pioneer 7B deployment were NOT caused by" manufacturing defects.

115.    Under section 2 of the memo, entitled "Glider Assembly Processes and Procedures," Relator explains how the investigation revealed "that processes and procedures used by the manufactures' personnel were more robust than those used by WHOI personnel."  In section 4, "Chain of Custody," Relator wrote, "During the investigation, it was realized that WHOI orders gliders from [Teledyne] in a 'Not ready for Deployment' condition. Therefore, WHOI takes the responsibility for final glider assembly."  Relator observed that "All OOI open ocean gliders that leaked within the past year were also assembled by WHOI personnel."

116.    Relator concluded the draft of the glider report by listing recommendations and directives COL should issue to the other involved organizations, including WHOI. The first recommendation was to have Teledyne deliver each glider to WHOI in a "Deployment Ready condition." This action was designed to minimizes the risk of leaks and increase the reliability of OOI glider performance.  Relator also suggested that Teledyne ballast each glider prior to delivery to WHOI.  Finally, Relator requested that COL direct Teledyne to lead all preparations for the remaining 2017 glider deployments under the OOI.

117.    In a draft of the COL glider report dated August 8, 2017, Ulses maintained much of the contents of Relator's draft of the report, but only after Relator and COL's Les Anderson insisted that COL use strong enough language to convey how WHOI's actions directly led to the glider leaks. In the section titled "COL Finding," Ulses explained that because Teledyne offered gliders in a "Ready for Deployment State" before delivery, "WHOI's activities of re-opening, ballasting, and resealing gliders *is a redundant task*." (Emphasis added.)   Three additional conclusions followed under this heading:

    A.  The cause of the leaks were [sic] found to be attributed to human error by WHOI personnel during final assembly of gliders.
    B.  The OOI program would achieve a reduction on operating cost of more than $1,000,000 each year if WHOI received gliders in a "Ready for Deployment

State" and ceased glider assembly operations. This move would also reduce the need for glider assembly facility space, thus reducing the costs to the OOI Program.

C. The OOI program would likely achieve a higher glider operational reliability if all gliders were received in a "Ready for Deployment State."

118.     In the "Chain of Custody" section, Ulses adds to the information included by Relator to criticize WHOI's failure to disclose relevant facts in its glider report: "WHOI purchase documents to [Teledyne] specify they are not ordering gliders that are ready to deploy. This was confirmed with WHOI and [Teledyne], however this was not reported in [WHOI's] '2017 0614 3111-00043 Pioneer 7B Glider Investigation Report.'"

119.     Among the attachments included with this draft were (1) investigation reports from WHOI, Teledyne and Raytheon; (2) an Interim Status Report from Relator and COL's Les Anderson's report; and (3) the COL Glider Prep Directive to WHOI and Teledyne.  With the exception of WHOI's own investigational report, the other attachments pointed to WHOI's poor procedures and lack of appropriate facilities as the cause of the glider leaks.  WHOI's report significantly softened the language identifying WHOI's actions and inactions as the principal cause of the leaks.

120.     The report created by Relator and Anderson was never submitted to NSF.  Instead, Jon White and Greg Ulses spent the next three months minimizing the potential damage the final report could cause to WHOI and COL.  In particular, Ulses repeatedly removed all statistics and charts from Relator's report.  Ulses also took out chain of command information, which pointed liability for the leaks directly at WHOI.

121.     All of this information would have revealed to NSF that WHOI's glider program was more prone to errors than either the Navy's glider program or Rutgers' own glider program. WHOI's glider success rate ranged between 50% and 60% whereas the Navy and Rutgers enjoyed glider success rates of approximately 85%.

122.    On August 7, 2017, Relator sent an email to Ulses, copying Les Anderson and Susan Banahan, both COL employees.  Attached to Relator's email were the final version of the COL to NSF Forensic Glider Report, dated August 8, 2017, the Pioneer 7B Glider Investigation Report, dated June 14, 2017, the Leak Investigation History Record, dated May 31, 2017, the Review of Slocum Glider Assembly Reliability, dated May 18, 2017, Les Anderson's Report, dated June 13, 2017, Relator's Interim Status report, dated May 8, 2017, and the COL Glider Prep Directive to WHOI and Teledyne, dated July 11, 2017.

123.    In the email, Relator offers four comments to Ulses for his consideration prior to submitting COL's report:

- The COL report is written for [sic] the COL perspective to show we are providing oversight on the OOI program.
- The fact that WHOI was the [sic] responsible for final assembly of the gliders is in their report. WHOI also notes that they will keep pets from their work spaces.
- The COL findings and detailed summary of each glider is mentioned in all three supporting reports. If COL does not note the finding and summary assessments by glider tail number, COL would be deemed negligent.
- It is probable and likely that the supporting reports from WHOI, TWR, and Raytheon have been submitted to NSF by the author organizations. If COL does not include those reports, Col will be guilty of withholding pertinent information to the government.

124.    Relator closed out his email to Ulses by explaining, "In summary, COL must tell the 'whole truth' to NSF.  There is nothing in the COL report that will be a surprise to any of our sub-awardees and stakeholders."

125.    Ulses decided to remove all detailed summaries of each glider and refused to provide to NSF the supporting investigative reports prepared by WHOI, Teledyne and Raytheon; and instead only referenced the reports in COL's own report.

126.    After sending this email, White called Relator into his office.  White told Relator, "We're not sending this material.  We aren't responsible for what WHOI does."  White added, referring to himself: "Nobody is ever going after an Admiral."

127.    On September 5, 2017, White and Ulses sent to NSF the Pioneer 7b Leak Investigation Report.  The report was intended to deceive NSF by manipulating the facts in order to minimize WHOI's responsibility.

128.    In the second paragraph of the report, White and Ulses state that "In coordination with COL, WHOI initiated a series of investigations, which were completed in June," despite the fact that WHOI did not want the glider leak investigation to take place at all.

129.    And while an earlier version of the report, dated June 14, 2017, contained references to an enclosure that was to include the Teledyne and Raytheon reports, White removed the reference to these reports because they were more critical of WHOI's actions and inactions than the COL report ultimately given to NSF.

130.    By removing those two documents, COL ensured that NSF would receive misleading information about the glider investigation.

131.    The conclusions COL presented in its final report reflected these misleading half-truths.  Specifically, COL instead stated, "While it is likely that this O-ring contamination occurred during glider reassembly conducted at WHOI prior to deployment (see below for discussion of chain of custody), we cannot rule out the possibility that leaks in these three gliders were caused by manufacturer defects or errors during assembly."

132.    COL ends the report by promising "to actively monitor and review the OOI ocean glider program and will continue to keep the NSF fully informed of new developments and any substantial pending actions."

133.    Despite making those assurances to NSF, COL failed to fully inform NSF of the problems associated with the glider program.  In the months preceding the submission of the glider leak report, COL was presented evidence demonstrating that WHOI was performing duplicative work by unnecessarily re-opening and re-sealing the gliders.  And not only was WHOI's unnecessary work being charged to NSF, but it was also the principal cause of the leaks that forced NSF to ultimately halt glider operations.

134.    Yet most of this information was deliberately withheld from NSF and its glider review committee.

135.    WHOI's performance of this duplicative and unnecessary work led to NSF being overcharged by at least $3 million each year.  COL and WHOI conspired to mislead NSF for the sole purpose of charging more money for glider operations.

136.    WHOI was ultimately paid monies for costs that it would not otherwise have been paid had it fully disclosed the nature of those costs under the applicable rules and regulations.

B.    **RUTGERS**

1.    **Defendant Rutgers Used a non-CAS Compliant Accounting System to Purposefully Deceive NSF and Receive Reimbursement for False Invoices**

137.    As a condition of receiving payment for costs and effort expended on the OOI, Rutgers certified that each Request for Funds "has been drawn in accordance with the Terms and Conditions of the Subaward and that the Funds will be appropriately accounted for." Among the Terms and Conditions of the Subaward were various "Flow Down Articles" from NSF FATC, including the "Allowable Costs" section which applied the Federal cost principles found in 2 CFR Part 220, Cost Principles for Educational Institutions (OMB Circular A-21) to the Subaward.

138.    Rutgers received $4.5 million in annual OOI Subawards that were to be used toward its program costs.  From the outset, Rutgers treated its Subaward as a firm, fixed price contract—

despite the fact that NSF created the OOI as a Cost Reimbursement, No Fee Type Subaward.  As evidence of its intent, Rutgers simply divided its annual Subaward into twelve equal installments, which it billed to COL (and ultimately NSF) every month. By treating the OOI Subaward as a fixed price contract, Rutgers was able to more easily bill for costs never incurred and time never expended.

139.    Rutgers routinely overbilled NSF for labor expended on the OOI program.  More specifically, Rutgers submitted invoices to COL for man-hours spent by personnel on OOI, representing an average of eight people for each billing period.  But Rutgers never identified all eight individuals who were supposedly working on the OOI program.  Moreover, COL was aware of only three Rutgers personnel who actually performed any function on the OOI.   Rutgers also routinely billed NSF for work done during times when the University was otherwise closed, including spring breaks and year-end holiday breaks.  Rutgers repeatedly declined to provide COL requested timecard reports for the OOI because such reports would reveal that Rutgers was overcharging for labor and personnel costs on the OOI program.

140.    Further, Rutgers failed to install a qualified, full-time Project Manager to oversee its OOI Subaward.  Instead, it assigned a visiting assistant professor (Dr. Ivan Rodero) to the project who had no previous experience managing a government grant program of this magnitude. Beyond that, Rutgers staffed the OOI with professors (like Dr. Rodero) who already were working at least eight hours a day as instructors at the University on matters unrelated to the OOI.  Rutgers would then bill the OOI program for four or more of those eight hours of work.  In other words, Rutgers was billing NSF for man-hours spent by University employees on work other than the OOI or, in some instances, simply submitting invoices for hours worked by individuals who were neither identified nor performed any work attributable to the OOI.

141.   And COL management was fully aware that the Rutgers invoices for personnel were incorrect and unjustified.  Despite having internal discussions of these precise issues with Rutgers from at least June 2016 through November 2017, COL management declined to request additional billing details from Rutgers and thus failed in its obligation to properly manage the University's overbilling under the subaward.

142.   Rutgers also routinely overbilled NSF for costs supposedly expended on the OOI. As part of its $4.5 million annual Subaward, the University was tasked with operating and maintaining the out-of-date data tape back-up systems at three separate data centers.  However, from July 2014 to the present, Rutgers performed this task at only two data centers, which were located at Rutgers' CoRE facility and at Oregon State University.  Rutgers was never able to get the third data center—budgeted as a back-up call center—operational.

143.   The budgeted costs and labor associated with the third data center were approximately $1 million per year in facility rentals, telecommunication lines and staffing of at least two to three Rutgers personnel.  Apart from fraudulently seeking reimbursement for costs associated with operating *all three* facilities as originally contemplated (and funded) by NSF, Rutgers also never replaced those outdated systems with the more conventional disk drive systems that it nevertheless sought and obtained payment for.

144.   Rutgers' submission of Requests for Funds to receive that funding was conditioned on the certification that Rutgers would use the funds in accordance with the Subaward and that the funds would be appropriately accounted for.  Rutgers' failure to comply with either requirement represents a false claim which resulted in payment to Rutgers.

145.   Rutgers was ultimately paid monies for costs that it would not otherwise have been paid had it fully disclosed the nature of those purchases under the applicable rules and regulations.

2.     **Defendant Rutgers Submitted False Invoices for Inadequate and Unperformed Work and Deceived NSF by Concealing the Extent of Rutgers' Underperformance**

146.     As a condition of receiving payment for costs and effort expended on the OOI, Rutgers certified that each Request for Funds "has been drawn in accordance with the Terms and Conditions of the Subaward and that the Funds will be appropriately accounted for." Among the Terms and Conditions of the Subaward were various "Flow Down Articles" from NSF FATC, including the "Allowable Costs" section which applied the Federal cost principles found in 2 CFR Part 220, Cost Principles for Educational Institutions (OMB Circular A-21) to the Subaward.

147.     As outlined in the Scope of Work section of Rutgers' Subaward, Rutgers was required to "execute the tasks relating to the design, fabrication, integration and installation of the OOI that are pertinent to Subrecipient's particular role as the Education and Public Engagement (EPE) Implementing Organization (IO) and that are more fully described in the OOI Project Execution Plan (PEP)."

148.     Rutgers did not perform the Cyber-Infrastructure activities as required by its Subaward. Rutgers' inadequate performance was identified and presented to COL management by COL employees Relator Wims (OOI O&M Manger/COTR) and Patrick Donohue (OOI Contracting Officer).

149.     By November 3, 2016, COL had drafted a "Cure Letter" to Rutgers, which was to serve as notice "to cure anticipatory breach of contract based on non-performance and to demand meeting with the National Science Foundation OOI PMO and Subawardee." One of the potential remedies listed in the Cure Letter was for "cash [to be] returned to the customer/awardee by the sub awardee" or even contract termination.

150.     Among the problems identified in Appendix A to the Cure Letter were Staffing ("The CI staff is not meeting the program objectives"), Scheduling ("Schedules have not been

produced during 2016"), Communications ("Periodic verbal technical briefings, but no Cost, Schedule, Tech Status reporting."), Strategic Planning ("RU has not taken the lead on planning the CI activities during 2016 and has no 2017 plan"), CI Network Security ("Security vulnerability is high"), CI Network Monitoring ("Lack of network planning generates a high risk of OOI failure"), Reporting ("Infrequent quarterly reporting received. Emails do not address the status of the broad scope of the program"), Metadata Management ("No know archives have been demonstrated to the OOI PMO and NSF customer"), External Archive Management ("No plan presented. Data not transferred to IRIS and NODC on a regular basis"), and Workshops ("None of the required 4 workshops were held in 2016").

151.    COL never sent the Cure Letter to Rutgers.  Instead, at the direction of President and CEO Jon White, COL sent a Corrective Action Plan ("CAP") Requirement Letter, which is a downgrade from a Cure Letter and a less severe reprimand.  White's decision was made to avoid drawing NSF's attention to the widespread problems with Rutgers' performance.

152.    Rutgers failed to complete the work as assigned in its Subaward and failed to adequately perform other work assigned in its Subaward.  Despite these performance issues, Rutgers submitted invoices to COL for payment from NSF for work it had either not completed or had failed to complete to the degree required by its Subaward. By submitting these invoices, Rutgers was falsely certifying that the work performed on OOI was completed as required by the NSF award to COL and COL's Subaward to Rutgers.  Had Rutgers not certified compliance with the work requirements, it would not have been eligible for payment from NSF funds.  Had the United States not relied on Rutgers' false certifications, it would not have transferred those funds to Rutgers.

153.    Rutgers was ultimately paid monies for certain services that it would not otherwise have been paid had it fully disclosed the nature of its work product under the applicable rules and regulations.

C.    **DEFENDANT COL HAD KNOWLEDGE OF AND FACILITATED THE SUBMISSION OF FALSE INVOICES BY SUBCONTRACTOR DEFENDANTS**

154.    NSF's Cooperative Agreement FATC assigns the awardee "full responsibility for the conduct of the project or activity supported under this award and for adherence to the award conditions."

155.    "The awardee is responsible for notifying NSF about: (1) any allegation of research misconduct it concludes has substance and requires an investigation in accordance with NSF research misconduct regulations published at 45 Code of federal Regulations (CFR) Part 689; or (2) any significant problems relating to the administrative or financial aspects of the award." Requests for Funds for costs that are not allowable, allocable, or reasonable for the OOI project qualify as "significant problems" concerning the "financial aspects of the award."

156.    On September 30, 2010, the NSF Office of the Inspector General ("NSF OIG") released its Audit Reports of COL's Accounting System (Audit Report No. OIG-10-1-011) and the Proposed Budget for OOI (Audit Report No. OIG-10-1-012). NSF OIG contracted with the Defense Contract Audit Agency ("DCAA") to perform these audits. DCAA reported to NSF OIG that COL's accounting system was not CAS compliant, which led DCAA to conclude that:

> There could be a material impact to the government in future periods because the merger [between the Joint Oceanographic Institutions (JOI) and the Consortium for Oceanographic Research and Education (CORE)] brought additional work from other organizations and other federal agencies into the total activity of COL. Therefore, the risks of misallocating G&A [General & Administrative] costs between NSF programs and different government agencies will increase as COL takes on more business and other programs with NSF and with other federal and non-federal organizations.

157.    NSF OIG indicated that, following a finding of noncompliance by NSF's Contracting Officer, "COL will be required to submit a cost impact proposal from the time of NSF's required date for Col to change its G&A base to comply with CAS until the completion of COL's CAS-covered contract (expected in September 2013). This cost impact proposal should monetize the impact of COL's change in accounting practice (i.e. change to a value-added G&A base) on all COL's contracts and awards."

158.    Even after this audit, COL's accounting system was never made CAS compliant. Although COL's accounting system was required to be CAS compliant under its Cooperative Agreement with NSF, COL time and time again delayed improving the accounting system, while simultaneously promising to bring the accounting system into CAS compliance.

159.    Neither COL nor WHOI used accounting systems adequate for maintaining separation between federal funds from different sources, such as funds from the ARRA and the MREFC. Instead, all funds were treated as single source from NSF with no regards to the ARRA Terms and Conditions requirements for maintaining records adequate for a potential audit.

160.    COL's unwillingness to comply with CAS and properly track federal funds meant that COL could not ensure that NSF funds were allowable, allocable, and reasonable, and that any cost savings could not be tracked and passed on to NSF. COL's noncompliance with CAS led to COL improperly receiving

161.    In performing an audit of COL's OOI construction proposal, DCAA also identified problems with the contingency costs included in the proposal. DCAA found that of the $105.93 million in ARRA funding, $34,205,053 was proposed contingencies and the $280.49 million of proposed MREFC costs contained $53,913,795 in proposed contingencies.

162.    DCAA pointed out that "COL classified contingency costs in the proposed budgets as equipment costs, but are not necessarily equipment. Contingency costs were proposed to ensure that COL will not overrun the budget." COL responded to this by explaining that "contingency costs can only be used if the awardee overruns the budget due to unforeseeable factors." In addition to the problem of miscategorizing NSF funds, "DCAA noted that COL can draw down the contingency funds the same as normal funds and DCAA found no controls or technical barriers to prevent COL from drawing down these funds and spending them without NSF approval. DCAA also noted that the awardee excluded the proposed contingency costs from its proposed G&A allocation base."

163.    As previously alleged, WHOI fraudulently uses these contingency funds for its benefit at NSF's expense.  WHOI improperly converts these "control accounts" into its own bank accounts.  Specifically, WHOI draws down an average of $1 million in NSF funds per month and then deposits the funds in these separate control account(s) to cover "contingencies."  By doing so, WHOI has created a nearly untraceable "contingency" fund of approximately $10 million every year.

164.    And while Relator expressed his concerns about this practice to COL leadership, he was instructed by CEO and President Jon White and Vice President Greg Ulses that COL staff were to keep their "hands off" of WHOI under the OOI.

165.    WHOI's improper use of NSF funds was exacerbated by COL's failure to maintain and utilize appropriate accounting practices—a failure that has persisted throughout the life of the OOI.

166.    In an email sent to Ulses and other NSF employees on July 17, 2017 concerning the 2018 OOI AWP (Annual Work Plan) and Budget, Bauke "Bob" Houtman requested COL

provide a basic cash flow analysis of the OOI.  In particular, Houtman wanted to know what how much funding had already been spent and how much would be carried over to the following year. Although COL's finance and accounting department kept track of all invoices and monthly spending associated with OOI, Ulses and Associate Project Manager Sue Banahan ignored those numbers and instead improperly used an accrual basis to determine the year end funding numbers. This ultimately led to COL submitting invoices with duplicative funding requests and NSF to be overcharged between $10 and $20 million per year.

167.    Following an independent audit of COL's FY2016 Financials, COL prepared a CAP that was "intended to guide COL in improving the timeliness of their submission of contract actions to the National Science Foundation (NSF) and Col subrecipient monitoring."  The background of COL's CAP explained that "on four occasions between November 2015 and early 2017, COL submitted contract actions to NSF in an untimely manner."  Of these four instances of late submission, one "resulted from COL shortfalls in monitoring and modifying subcontracts under its direct management.  The other three incidents resulted from COL receiving contract actions from a subawardee [Woods Hole Oceanographic Institution (WHOI)] in an untimely fashion, which points to shortcomings in COL's ability to monitor subawardee performance."

168.    COL's CAP explicitly laid responsibility for implementation with COL's Jon White: "COL President/CEO, RADM (Ret.) Jon White, USN, is accountable for the overall execution of this CAP, working closely with the Chief Financial Officer (CFO) and Ocean Observatories Initiative (OOI) Director to ensure the implementation of all actions within."

169.    COL's CAP discussed the development of a CAP for WHOI "to improve their procurement planning process as well as timely and accurate submission of contract actions."  WHOI's CAP requirements were made part of WHOI's obligations to NSF after "the CAP was

approved by COL on January 26, 2017 and has been formally applied to WHOI via a subaward modification." Part C of the "Task-level Detail" for WHOI's CAP stated that "COL will provide WHOI with additional direction by May 31, 2017 if COL determines that WHOI's financial reporting and project monitoring do not meet the standards required by the CAP." WHOI's financial reporting to COL and, in turn, NSF, was insufficient prior to the CAP and neither COL nor WHOI took action after the CAP to correct these problems.

170.    Ultimately, neither the COL CAP nor the WHOI CAP led to any meaningful changes in the way that COL managed its subawardees.

171.    On July 17, 2017, COL submitted its Quarter 2 Financial Status Report (April-June 2017) ("Q2 Report"). In an email dated July 17, 2017, COL's CFO Yan Xing informed White that she "simply cannot sign the Q2 report with the certification included by Greg [Ulses] in his signed letter." The certification Xing refers to is as follows:

> The COL Chief Financial Officer hereby certifies that the financial information provided in this Quarterly Report is accurate. However, as noted in Enclosure (1), an amended version of the financial section of this report will be provided to the NSF next month to revise projected cost savings for the remainder of the Project Year 8.

172.    CFO Xing refused to certify that the financial information was accurate because Ulses included financial numbers in the Q2 report that were inaccurate. Relator and other COL employees identified errors in the Q2 Report that led to the overstatement of costs by about $30 to $40 million. COL never explained those errors to NSF nor did COL ever correct those errors. Instead, White and Ulses directed Xing to sign the Q2 Report, albeit with a softer "certification" based on a suggestion by Xing:

> My Signature indicates that financial figures presented within this report have been reviewed by my office and represent the numbers provided by the PMO and the IO's for my review. However, the total projected costs for PY8 is under extensive review by both the PMO and COL Finance and Accounting office. The total projected cost will subsequently be updated and certified by me not later than

August 14th, after all follow-up questions and concerned [sic] have been resolved. Full certification by COL's CFO will depend on adequate data and supporting documentation to justify the projected costs\obligation\commitment as reasonable.

173.    COL's failure to inform NSF of the nature and magnitude of the errors in the Q2 Report's financial numbers, NSF permitted the drawdown of the funds requested for the PY8. Had NSF known the full extent of COL's intentional errors, NSF would not have permitted COL to draw down the funds which were being overcharged to NSF.

174.    In addition to errors in the financial numbers, COL's Q2 Report contained other falsehoods. For one, COL explained that the estimated expenses for the IOs (Implementing Organizations) were significantly higher for the completion of the PY8 than for PY7 in part because "Rutgers installed a new accounting system in October 2016 which encountered delays in full implementation resulting in lags invoicing for labor." However, Relator knows of no meaningful differences between Rutgers' new and old accounting system in how they impacted Rutgers' work and reporting compliance on the OOI. For example, both before and after October 2016, COL never received labor hours reports from Rutgers that showed time spent by each employee on OOI tasks.

175.    COL also states in its Q2 Report that "[w]e are confident that additional cost savings will be realized from reductions in refurbishment, cruise costs, and staffing levels (including reductions in contractor support and labor associated with refurbishment for descoped infrastructure)." Relator is aware that WHOI achieved cost savings. However, those cost savings were never passed on to NSF. Instead, WHOI, through COL, continued to drawdown funds as though they had not achieved cost savings and simply kept the funds.

176.    On September 6, 2017, COL completed an "Assessment of WHOI Compliance with Reporting Guidelines." COL identified the guidelines with which WHOI was required to comply. Under 2 C.F.R. § 200.302(b)(3), WHOI needed to maintain "records that identify adequately the

source and application of funds for federally-funded activities. These records must contain information pertaining to Federal awards, authorizations, obligations, unobligated balances, assets, expenditures, income and interest and be supported by source documentation." WHOI was also required, under Amendment 22 to "Operations and Maintenance of the Ocean Observatories Initiative (OOI)," to "identify budget underruns and all potential areas of cost savings, including procurements, refurbishments, deployment/recovery cruises, and staffing levels."

177.    In its assessment, COL found that WHOI "did not accurately identify activities and estimated costs associated with Program Year 7. As a result, the calculation of uncommitted carryforward for Program Year 7 was understated. In addition, it appears unlikely that budget underruns have been adequately estimated for Program Year 8.  Program Year 8 costs have been estimated assuming a burn rate well in excess of historical actuals." The cause of these inaccuracies in WHOI's budget, according to COL, was that "WHOI project management and estimating systems are unable to accurately identify those activities which represent committed vs. uncommitted carryforward with respect to the Operations and Maintenance of the OOI."

178.    During Program Year 7, WHOI drew down more funds than they actually needed to complete the required work on OOI.  WHOI stored that money in uncommitted reserves or in two hundred or more control accounts and never actually use the funds to perform work on OOI. WHOI maintained at least $10 million in uncommitted funds during Program Year 7, an amount in "contingencies" that far exceeded what was necessary for the size of the Subaward.  The majority of these funds, which were never used by WHOI to complete work on OOI, were never returned to NSF nor properly tracked in accordance with the requirements included in WHOI's Subaward.

179.    The assessment ended with the requirement that WHOI "provide Ocean Leadership with accurate reporting in all instances." This requirement was only added to the assessment following a request made by Relator.  However, COL never actually ensured that WHOI complied either with the requirements stated by COL or the requirements associated with the OOI award and subaward.

180.    COL was aware of the fraudulent Requests for Funds submitted for reimbursement by WHOI and Rutgers. COL failed to question WHOI's and Rutgers' fraudulent requests and COL management was complicit in providing incomplete or inaccurate information and requests for reimbursement to NSF. COL never required WHOI or Rutgers to submit accurate and updated lists of employees and subcontractors assigned to the OOI program to ensure that costs passed on to NSF for reimbursement were accurate, allowable, allocable, and reasonable.

181.    COL employees, including Relator Wims, informed White and Ulses of the discrepancies and errors within WHOI's and Rutgers' invoices and the accompanying Requests for Funds.  White and Ulses responded by ordering COL personnel to stop all investigations into false invoices submitted by WHOI and Rutgers.

182.    COL allowed WHOI to submit confusing invoices categorized by "Control Account" with inadequate documentation for the following types of costs: facilities, manpower/labor/personnel, subcontractor manpower/labor/personnel, physical materials and equipment costs, and tools and other infrastructure costs.

183.    COL management knew that Rutgers' invoices, including for manpower allocations,  were incorrect and unjustified.  Yet COL refused to request additional billing details from Rutgers in an effort to ensure the charges from its Subawardee were allowable, allocable, and

reasonable.  Instead, COL permitted Rutgers to submit erroneous invoices for labor by unidentified individuals from at least 2015 through 2017.

184.    Rutgers did not perform the Cyber-Infrastructure activities as required by its Subaward.  This subpar performance was identified and presented to COL management by COL employees Relator Wims (OOI O&M Manger/COTR) and Patrick Donohue (OOI Contracting Officer).

185.    And as previously alleged, COL never delivered the Cure Letter to Rutgers. Instead, at the direction of President and CEO Jon White, COL simply sent a CAP Requirement Letter so as to avoid drawing NSF's attention to the widespread problems with Rutgers' performance.

186.    Upon discovering discrepancies and inaccuracies in the invoices submitted for reimbursement by Subawardees WHOI and Rutgers, COL had the affirmative duty to notify NSF of these fraudulent Requests for Funds.  Instead, COL assisted with the submission of these invoices and knowingly and willfully permitted WHOI and Rutgers to continue to receive reimbursement for charges that were not allowable, allocable, or reasonable under the OOI Cooperative Agreement and Subawards.

## VI.    DEFENDANTS CONSPIRED WITH OTHER ENTITIES TO DEFRAUD THE UNITED STATES

187.    As alleged in this Complaint, one facet of the Defendants' scheme involved one or more plans with other entities to further the overall fraudulent submission of Requests for Funds through a pattern and practice of false and misleading representations ("overt acts").

188.    The overt acts included the submission to Government Programs by these affiliated entities of knowingly false certifications of compliance with laws that are conditions of Government Program payments (which certifications were false at the time the certifications were

made).  As a result of these false certifications, Government Programs made payments to Defendants under NSF Cooperative Agreements that Defendants were ineligible to receive.  The Co-Conspirators include numerous other related entities through which the Defendants have conducted their fraudulent scheme.

189.   Defendants and their co-conspirators shared in the conspiratorial objective to deceive the United States concerning their expenditure of funds and reimbursements with federal funds and further agreed and intended to each perform and to each benefit from these unlawful overt acts in furtherance of Defendants' scheme to target and financially injure Government Programs.  Accordingly, Defendants and the co-conspirators entered into these unlawful financial relationships for the purpose of Defendants' planned scheme to target Government Programs and submit or cause the submission of false or fraudulent claims and records.

190.   As alleged in this Complaint, Defendants intentionally conspired amongst themselves to get false or fraudulent claims allowed or paid by the United States; one or more of these conspirators performed one or more overt acts to effect the object of the conspiracy; and Government Programs suffered damages as a result of the false or fraudulent claims.

191.   Through the acts and omissions alleged in this Complaint, and from at least 2009 to the present, Defendants, with each other and with entities known and unknown, knowingly agreed and conspired to defraud the Government by having false or fraudulent statements, records, certifications, and invoices submitted to, paid and approved by Government officials, their contractors, intermediaries and/or their agents.

192.   By virtue of their conspiratorial agreement, Defendants caused to be presented, made and/or used false or fraudulent invoices, and/or false records or statements, causing the United States to suffer significant damages.

193.    The United States is therefore entitled to recover from Defendants treble damages under the Federal FCA, in an amount to be proved at trial, plus a civil penalty of at least $5,500 for each violation.

## VII.   DEFENDANTS' FRAUDULENT SUBMISSION OF FALSE CLAIMS TO FEDERAL PROGRAMS

194.    Defendants made fraudulent representations to the United States each time they declined to submit required quarterly technical and financial report as required by the NSF from 2015 through 2016.  Defendants also knowingly submitted false periodic technical and financial reports from at least 2016 through the present that were required by NSF.

195.    The Defendants' fraudulent scheme served its intended purpose, as they induced NSF to pay the Defendants monies for expenses that were ineligible for reimbursement under the Cooperative Agreements.

196.    The intentional misrepresentations regarding the eligibility for reimbursements of costs, which were contained in their certifications submitted to Government Programs, were false within the meaning of the federal False Claims Act.

197.    By falsely certifying their eligibility to receive monies for costs accrued and causing subsequent claims for payment to be made that Defendants knew were ineligible for payment by Government Programs, Defendants also made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as described herein.

198.    Defendants' unlawful conduct resulted in tens of millions of dollars in improper payments by Government Programs.

## VIII.   COL'S UNLAWFUL RETALIATION AGAINST RELATOR WIMS

199.    Relator joined COL in May of 2016 as its Operations and Maintenance Manager for the NSF's OOI.  In his role, Relator managed the largest set of ocean sensing equipment in the

world.  This equipment set was comprised of more than 1,600 instruments on more than 80 platforms located in the North and South Atlantic Oceans.  Relator was directly responsible for managing the acquisition, refurbishment, deployment and retrieval of this equipment.

200.    Relator also served as the Contracting Officer Technical Representative ("COTR") for the OOI and included responsibilities such as managing the subcontracts with marine operators, equipment manufacturers and shipping firms.  As COTR, Relator oversaw the management of the data centers and data portals, which allows scientists worldwide to access data collected as part of the OOI.

201.    Shortly after beginning his employment with COL, Relator observed that Defendants were engaged in numerous operational and financial improprieties under the OOI.  And Relator learned that COL management and WHOI worked closely to conceal this fraudulent conduct from the NSF.

202.    Relator repeatedly reported his concerns about Defendants' fraudulent conduct under the NSF grants to COL leadership, including COL's Board of Directors.  In addition to his internal reporting, Relator also offered recommended solutions, in writing and in person, in an effort to remedy the fraudulent activities.  Despite his best efforts, however, COL ignored his reports and recommendations, thus allowing the illegal conduct to continue.

203.    For example, in an August 10, 2017 email addressed to COL's senior management, including but not limited to Jon White (COL President and CEO) and Greg Ulses (COL VP and Program Director of the OOI), Relator writes that "NSF could argue that they made flawed program decisions to deploy gliders based on the information and/or lack of information received from the OOI PMO.  NSF could seek damages from COL for the cost of glider operations, the loss

of science data, and for misleading a branch of the federal government." Relator added that "[i]f NSF seeks damages, COL could end up owing NSF significant dollars."

204.    Then, in an email dated September 26, 2017, Relator thanks COL Board of Director Jim Sanders for the opportunity to have recently met with him to discuss Relator's concerns. In the email, Relator reiterates that he will continue to report his concerns "to prevent negative actions from the NSF Office of the Inspector General" despite the fact that Relator had "pushed these issues up the proper chain of command at COL for more than a year, to little avail."

205.    Among the specific concerns Relator shared with Director Sanders included (1) COL intentionally "[m]isrepresenting OOI financial data" that caused it to "under run the OOI program by $20 M/year since 2015"; (2) OOI Principal Investigator Greg Ulses was "directing [Relator] to inform the NSF that COL had 64 gliders when only 53 remained in inventory as of 9/2016"; and (3) COL "[w]ithholding time sensitive information from the NSF customer (4 month delay in sending the May 2017 glider report and recommendations)," which "resulted in additional glider failures and the NSF canceling the glider program in August 2017."

206.    Relator closed his email by making clear his commitment to adhere to the relevant rules and regulations, stating "I will not misrepresent the truth or withhold pertinent information from you, COL management, and certainly not NSF." He also offered to make himself available to any other COL board member:

> While you and I spoke in confidence, I allow you to discuss these concerns with Trustees of your choice. Help me keep COL alive and financially viable. Reaching out to you is my last hope of effecting positive change at COL, in a timely manner. I hope to see you in person during the October Board meetings. You can call me on my cell, day or evening, and weekends if necessary.

207.    Shortly after reporting his concerns to members of COL's Board of Directors, Relator was summoned to a meeting with White and COL Senior Human Resources Consultant

Alicia R. Schoshinski.  Rather than address Relator's efforts to "effect positive change," COL instead issued Relator a memorandum, dated October 18, 2017, entitled "Reporting Change and Revision of Duties."  As part of this reassignment, Relator's duties were limited to reporting directly to White.  Relator's title remained the same and his work was still billed to the NSF grant.

208.    While COL attempted to spin the new assignment as a positive development, Relator understood the reassignment to be a thinly-veiled attempt to keep Relator from observing the fraudulent conduct that he had previously identified and reported.  In fact, the memorandum reinforced the plan to cordon off Relator from the rest of the OOI operations as White "consider[ed] these tasks to be largely performed internal to COL," advising that White was to be notified in advance "if external coordination is warranted."

209.    Thereafter, in November 2017, at the request of the COL board of Trustees, Relator collected all the documentation related to the fraudulent conduct he had observed and provided these materials to COL's outside legal counsel.  Among the materials Relator provided to counsel were various drafts and final documents relating to the forensic glider leak investigation.  The documents demonstrated that COL management intentionally concealed critical information from NSF.  The final version of the glider leak report that COL provided to NSF misrepresented the facts in order to conceal WHOI's misconduct.

210.    In late November 2017, counsel acknowledged receipt of the documents Relator provided and indicated they would review the materials.

211.    A mere four days later, on December 4, 2017, Relator was again summoned to White's office.  Present along with White was Senior Human Resources Consultant Schoshinski. During the meeting, White informed Relator that his employment was terminated because his job

position under the OOI was being eliminated.  Relator was given a termination letter of the same date regarding "the elimination of [Relator's] position."

212.    On February 27, 2018, White announced to the OOI team that COL had contracted with Logistics Management Institute ("LMI"), an outside vendor, to help support COL in leading and managing the continuation of the OOI program.  As part of the contract with LMI, COL hired Chris Rutherford as OOI's Program Director and Jessica Jalali as its Program Support Specialist.

213.    Jalali's roles and responsibilities as the OOI Program Support Specialist were nearly identical to Relator's previous position that had supposedly been "eliminated," confirming that the justification offered for terminating Relator was simply a pretext for illegally retaliating against him for engaging in protected conduct.

214.    COL's unlawful and retaliatory termination of Relator was motivated because COL's knew that Relator was taking the above described lawful acts.

### COUNT I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))[1]

215.    Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Complaint as though fully set forth herein.

216.    This is a claim for treble damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

217.    Through the acts described above, Defendants and their agents and employees knowingly misrepresented submitted or caused to be submitted to the United States Government knowingly false or fraudulent claims for set-aside small business contracts.

---

[1]  To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(1) (2006).

218.    As alleged herein, Defendants' representations to the United States were knowingly false. By engaging in the conduct described herein, Defendants knowingly submitted, or caused to be submitted, false or fraudulent claims for payment or approval to the United States in violation of 31 U.S.C. § 3729(a)(1)(A), by submitting a request and final report to the NSF for grant monies that Defendants were not entitled to receive.

219.    Through the acts described above, Defendants and their agents and employees knowingly made, used or caused to be made or used false statements and records to get such false and fraudulent claims paid and approved by the United States Government.

220.    The United States, unaware of the falsity of the records, statements and claims made by Defendants, paid Defendants for claims that would otherwise not have been allowed.

221.    By reason of Defendants' false records, statements and claims, the United States Government has been damaged and continues to be damaged in an amount involving tens of millions of dollars.

## COUNT II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))[2]

222.    Relator realleges and incorporates by reference the allegations made in the preceding paragraphs of this Complaint as though fully set forth herein.

223.    As alleged herein, Defendants knowingly made false representations to the United States.  Defendants thus knowingly used false records or statements to get false or fraudulent claims paid or approved by the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

---

[2]  To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(2) (2006).

224.    Because of Defendants' acts, the United States sustained damages in an amount to be determined at trial and, therefore, is entitled to treble damages under the False Claims Act, plus civil penalties of not less than $5,500 and up to $11,000 for each violation.

### COUNT III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))[3]

225.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

226.    As detailed above, Defendants knowingly conspired, and may still be conspiring, with the various entities and/or persons described herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2); 31 U.S.C. §§ 3729(a)(1)(A) & (a)(1)(B).  Defendants and these entities and/or persons committed overt acts in furtherance of the conspiracy as described above.

227.    As a result of Defendants' actions, as set forth above, the United States of America has been, and may continue to be, severely damaged.

### COUNT IV
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))[4]

228.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

229.    As alleged in detail above, Defendants knowingly avoided or decreased their obligation to pay or transmit money to the Government. Specifically, Defendants: (i) made, used, or caused to be made or used, records or statements to conceal, avoid, or decrease obligations to

---

[3] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(3) (2006).

[4] To the extent wrongdoing occurred prior to May 20, 2009, this Complaint should be deemed to include violations of the Federal False Claims Act prior to its recent amendments, *e.g.*, 31 U.S.C. § 3729(a)(7) (2006).

the United States; (ii) the records or statements were in fact false; and (iii) it knew that the records or statements were false.

230.    As a result of Defendants' actions as set forth above, the United States of America has been, and may continue to be, severely damaged.

**COUNT V**
**(Violation of False Claims Act, 31 U.S.C. § 3730(h))**

231.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

232.    Relator was threatened, harassed and discriminated against in the terms and conditions of his employment by COL in retaliation for lawful acts taken by Relator to report violations of the False Claims Act.

233.    Because of Relator's lawful acts in furtherance of protected activities investigating and reporting fraud, Defendant COL retaliated against Relator by terminating his employment.

234.    COL's unlawful termination of Relator has proximately caused Relator to suffer and to continue to suffer substantial damage, in an amount to be proven at trial.

**COUNT VI**
**(Violation of District of Columbia False Claims Act, D.C. Code § 2-381.04)**

235.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

236.    Relator was engaged in protected activity when he investigated false and fraudulent conduct by COL and reported that fraud to COL.

237.    COL had knowledge that Relator was engaged in such protected activity.

238.    COL terminated Relator's employment because Relator was engaged in such protected activity.

Filed Under Seal

239.     COL's unlawful termination of Relator has proximately caused Relator to suffer and to continue to suffer substantial damage, in an amount to be proven at trial.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE,** Relator prays for judgment against Defendants as follows:

A.     That Defendants be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. § 3729 *et seq.*;

B.     That judgment be entered in Relator's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per claim as provided by 31 U.S.C. § 3729(a), to the extent such multiplied penalties shall fairly compensate the United States for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery;

C.     That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

D.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by Relator, as provided for in D.C. Code § 2-381.04(b), to be identified at trial after full discovery, resulting from Defendants' unlawful retaliation against Relator;

E.     That Defendants be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

F.     That judgment be granted for Relator against Defendants for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit; and

G.      That Relator be granted such other and further relief as the Court deems just and

proper.

**JURY TRIAL DEMAND**

Relator demands a trial by jury of all issues so triable.

Respectfully submitted,

Andrew M. Miller, D.C. Bar #499298
W. Scott Simmer, D.C. Bar #460726
BARON & BUDD, P.C.
600 New Hampshire Avenue, NW, Ste 10-A
Washington, DC 20037
Telephone: (202) 333-4562
Facsimile: (202) 337-1039

*Counsel for Relator*

Dated:  May 4, 2018

Filed Under Seal
59